IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TONY FOSTER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 11 C 5623 |
| v. ) | |
| ) | Hon. Virginia M. Kendall |
| DR. PARTHASARATHI GHOSH, DR. ) | |
| N. PATTERSON, O.D., WARDEN ) | |
| MICHAEL LEMKE, and SARAH ) | |
| JOHNSON, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tony Foster filed suit against Defendants Dr. Parthasarathi Ghosh, Dr. Norman Patterson, Warden of Stateville Correctional Center Michael Lemke, and Sarah Johnson, a member of the Administrative Review Board (collectively, the "Defendants"). Foster alleges deprivation of his Eighth Amendment rights under 42 U.S.C. § 1983 as a result of Defendants' deliberate indifference to his serious medical needs. Foster's motion for a preliminary injunction requests an order that Defendants grant him access to an ophthalmologist to evaluate his cataracts and subsequently provide him with adequate treatment pursuant to that ophthalmologist's recommendation. The motion was presented on September 9, 2013 but the parties did not request a fact hearing. Dr. Patterson did not respond to the motion. For the reasons stated below, the preliminary injunction is granted.

## BACKGROUND

In 1977, Foster had surgery to correct a detached retina and cataract in his left eye and has been legally blind in that eye ever since.[1] He became a prisoner under the care of the Illinois Department of Corrections in January 1985. On April 30, 2008, Foster saw Dr. Patterson, an optometrist, regarding the return of the cataract in his left eye, asking him to remove it. Dr. Patterson declined to order surgery (he could not do it himself because he is not an ophthalmologist), and instead prescribed Foster eyeglasses to aid in his vision. Foster again saw Dr. Patterson concerning the cataract in his left eye on September 8, 2009. Again Dr. Patterson declined surgery and altered Foster's eyeglasses prescription. Foster filed a grievance with the Illinois Department of Corrections Administrative Review Board on December 1, 2009, complaining that Dr. Patterson would not remove the cataract from his left eye, and also that a cataract was forming in his right eye. Foster also stated in his grievance that he sought the assistance of Dr. Ghosh, then the medical director of Stateville. Foster's grievance was denied on March 22, 2010. The glasses prescribed by Dr. Patterson did not improve Foster's vision in either eye. In his Amended Complaint, Foster alleges that he filed "request slips" with Dr. Patterson six times from January 20, 2011 through March 23, 2011 and three times with Dr. Ghosh from January 13, 2011 through March 8, 2011. (Dkt. No. 76 ¶ 18–19.) Dr. Patterson and Dr. Ghosh deny knowledge of these writings in their Answers. (Dkt. Nos. 77, 78.) Foster's condition did not improve and he filed the present lawsuit on August 17, 2011.

---

[1] "A cataract is a condition of the eye in which the eye's natural crystalline lens becomes clouded and impairs vision. *In cataract surgery, the ophthalmologist* removes the opacified portion of the lens and replaces it with a clear plastic intraocular lens ('IOL'). The care required for patients who undergo cataract surgery with IOL implantation varies. Many patients are able to undergo the surgery on an outpatient basis. Other patients, however, are at higher risk for complications and must undergo cataract surgery on an inpatient basis, or may require additional preoperative or postoperative care." *Am. Acad. of Ophthalmology, Inc. v. Sullivan*, 998 F.2d 377, 379 (6th Cir. 1993) (emphasis added).

**DISCUSSION**

**I.     Standard**

A preliminary injunction represents an extraordinary exercise of judicial power, and is one that is "never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984).[2]  Whether such a remedy is appropriate depends upon a two-step inquiry in which the court first analyzes whether a given circumstance meets the necessary threshold, and then balances the risks of harm to each of the parties. *See Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America*, 549 F.3d 1079, 1085–86 (7th Cir. 2008). To demonstrate that a preliminary injunction is warranted, a plaintiff must show "1) it has a reasonable likelihood of success on the merits of the underlying claim; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if the preliminary injunction is denied; 4) the irreparable harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest." *Kiel v. City of Kenosha*, 236 F.3d 814, 815–16 (7th Cir. 2000).

The Prison Litigation Reform Act governs the Court's authority to enter an injunction in the corrections context. *Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012). Any remedial relief granted must therefore be "narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). Foster seeks a mandatory injunction, which is "an injunction requiring an affirmative act by the defendant," and as such must be "cautiously

---

[2] The federal preliminary injunction standard applies. *See Budget Rent A Car Corp. v. Harvey Kidd Auto.*, 249 F. Supp. 2d 1048, 1049 (N.D. Ill. 2003) (citing *Gen. Elec. Co. v. Am. Wholesale Co.*, 235 F.2d 606, 608 (7th Cir. 1956) and *Outsource Int'l Inc. v. Barton*, 192 F.3d 662, 673–74 (7th Cir. 1999) (Posner, J. dissenting)).

3

viewed and sparingly issued." *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (citations omitted).

**II.     Analysis**

The Court begins its analysis by noting that the preliminary injunction does not apply to Johnson because, as a grievance official, she was entitled to rely upon the findings of Dr. Patterson and Dr. Ghosh. *See Greeno v. Daley*, 414 F.3d 645, 657 (7th Cir. 2005).

   **A.     Foster's underlying claim has a reasonable likelihood of success.**

Foster's underlying claim is that the Defendants were deliberately indifferent to his serious medical need.[3] "The Eighth Amendment's prohibition against cruel and unusual punishment, which embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency,' prohibits punishments that are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). Consequently, the government must provide "medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. "The Eighth Amendment safeguards the prisoner against a lack of medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" *Rodriguez*, 577 F.3d at 828 (quoting *Estelle*, 429 U.S. at 102). Accordingly, "deliberate indifference to [the] serious medical needs" of a prisoner is unnecessary is forbidden by the Constitution. *Id.* at 104.

A deliberate indifference claim has two parts: an objective component and a subjective component. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). First, the inmate must

---
[3] The standard for deliberate indifference is derived primarily from cases discussing it in the context of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or a motion for summary judgment under Fed. R. Civ. P. 56. In its analysis, the Court applies this standard to the preliminary injunction requirement that there is a "reasonable likelihood" Foster will prevail on the merits of his deliberate indifference claim.

4

demonstrate, objectively, that the claimed deprivation was "sufficiently serious; that is, it must result in the denial of the minimal civilized measure of life's necessities." *Id.* (internal citation omitted). Where, as here, the prisoner asserts he received inadequate medical care, "this objective element is satisfied when an inmate demonstrates that his medical need itself was sufficiently serious." *Id.* A medical need is "sufficiently serious" when the prisoner's condition "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention." *Id.* (quoting *Greeno*, 414 F.3d at 653). Here, Defendants do not dispute that Foster has an objectively serious medical condition, and there is little question that cataracts meet this standard. *See Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (recognizing that cataracts can be a serious medical condition and will amount to a viable deliberate indifference claim).

As for the subjective component, the inmate must establish that prison officials acted with a "sufficiently culpable state of mind." *Roe*, 631 F.3d at 857. Although negligence or inadvertence will not be sufficient to show deliberate indifference, "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk." *Id.* (quoting *Greeno*, 414 F.3d at 653). In other words, "an inmate need not establish that prison officials actually intended harm to befall him from the failure to provide adequate medical care." *Roe*, 631 F.3d at 857. Instead, a prison medical official is deliberately indifferent when he realizes that a substantial risk of harm to the prisoner exists but disregards it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference can exist if prison officials refuse to provide a prisoner with access to doctors or unreasonably delay a prisoner's treatment such that it prolongs his suffering. *See Estelle*, 429 U.S. at 103–04. Continuing a treatment known to be

ineffective can also constitute deliberate indifference. *See Arnett v. Webster*, 658 F.3d 742, 752 (7th Cir. 2011).

In *Berry v. Peterman*, 604 F.3d 435, 438 (7th Cir. 2010), the prisoner had a toothache and complained of pain so serious that he could barely eat or drink. Due to overcrowding at his prison (where they had a dentist on staff), the prisoner was temporarily transferred to a jail (with no dentist on staff). *Id.* The prisoner's "modest request[s]" to see a dentist went unanswered for two months, in large part because the jail's doctor believed that any dental work could be completed when he was transferred back to the prison. *Id.* at 438, 441. When the prisoner did eventually transfer back, he was seen by a dentist and received an emergency root canal. *Id.* at 439. The *Berry* court denied summary judgment for the doctor and nurse who denied the prisoner's access to a dentist, finding that the doctor "knowingly adhered to an easier method to treat [the prisoner's] pain that [the doctor] knew was not effective." *Id.* at 441. The court noted that the doctor, "had not identified an effective pain medication, nor could she explain [the prisoner's] pain, yet she rejected the obvious alternative of referring [him] to a dentist." *Id.* It added that, "A basic dental examination is not an expensive or unconventional treatment, nor is it esoteric or experimental. Such examinations are inexpensive and commonly sought immediately to address severe dental pain." *Id.*

For Foster, documents provided under seal by the Defendants show that Foster first saw Dr. Patterson regarding his cataract on April 30, 2008. (Dkt. 108, Ex. A-2 at p. 299.) Dr. Patterson's notes state, "Wants Cat removed" and "Don't lik [*sic*] look." (*Id.*) Foster again saw Dr. Patterson regarding his cataract on September 8, 2009, and again Dr. Patterson notes, "Wants OS [left] Cataract removed." (*Id.* at p. 305.) Foster's prisoner medical file indicates numerous times that he had surgery for retinal detachment and cataract removal for his left eye in 1977.

6

(*E.g.*, Dkt. 108, Ex. A-1 at pp. 7, 8, 195.) Foster complained of new a new cataract in his left eye beginning in 2008 and of one forming in his right eye in 2009. When his condition did not improve, Foster notified Dr. Ghosh and requested his intervention, and also filed a grievance with Johnson. Thus, the Defendants were well aware of Foster's cataracts. *See Greeno*, 414 F.3d at 655 ("[T]here is no requirement that a prisoner provide 'objective' evidence of his pain and suffering—self-reporting is often the only indicator a doctor has of a patient's condition.").

Cataracts get worse over time, and the only treatment is surgical removal. *See Cobbs v. Pramstaller*, 475 F. App'x 575, 576 (6th Cir. 2012). Defendants argue that Dr. Patterson treated Foster when he complained of the cataracts by providing him with updated eyeglasses prescriptions. Short of referring Foster to an ophthalmologist, this was the only treatment Dr. Patterson could provide to Foster. This is because Dr. Patterson is an "O.D.," which stands for "Oculus Doctor" and is another way of saying "Optometrist." Although qualified to identify a cataract, as an optometrist Dr. Patterson is not qualified to operate on it. *See, e.g.*, *L. Klein v. Rosen*, 64 N.E.2d 225, 232 (Ill. App. Ct. 1945) ("Oculists and ophthalmologists pursue a calling quite distinct from that of optometrists. The first has relation to the practice of medicine and surgery in the treatment of diseases of the eye, and the second to the measurement of the powers of vision, and the adaptation of lenses for the aid thereof.") The adjusted eyeglasses prescriptions did not correct Foster's worsening eyesight, and his complaints persisted.

Foster, like the prisoner in *Berry*, is asking to see a specialist. He is not asking for any specific treatment, just to see an ophthalmologist and obtain an "adequate long-term medical solution," which this Court interprets to mean treatment aligned with the ophthalmologist's recommendation. This request, like the prisoner's request in *Berry*, is not expensive, unconventional, esoteric, or experimental. The only treatment Foster has received in prison is a

prescription for eyeglasses, which is not effective. Dr. Patterson has only examined Foster twice, and has continued with this ineffective treatment—rejecting the obvious alternative of referring Foster to an ophthalmologist—for what has become a period of five years.

When the limits of Dr. Patterson's care were reached but Foster's symptoms continued to worsen, Dr. Patterson should have referred him to a consultation with an ophthalmologist and Dr. Ghosh should have approved this referral. Absent this action, Dr. Patterson was "persisting in a course of treatment . . . known to be ineffective," demonstrating deliberate indifference to Foster's serious medical need. *Arnett*, 658 F.3d at 752. That Dr. Patterson was deliberately indifferent and not simply negligent is even clearer when compared to cases where the prisoner was referred to outside specialists for cataracts and other similarly serious but non-life-threatening conditions. *See, e.g.*, *Nichols v. Lappin*, 2012 WL 1902567, at *6 (M.D. Pa. May 25, 2012) (unpublished) (prisoner with a cataract was referred to an outside optometrist and an outside ophthalmologist); *Jones v. Sood*, 123 F. App'x 729, 730 (7th Cir. 2005) (unpublished) (prisoner referred to outside specialist for hemorrhoids); *Flayter v. Wis. Dep't of Corr.*, 16 F. App'x 507, 509 (7th Cir. 2001) (unpublished) (prisoner examined by outside doctors after complaining of rib pain); *King v. Cooke*, 26 F.3d 720, 721 (7th Cir. 1994) (prisoner referred to outside eye specialists due to injuries sustained from gas used by prison guards to subdue prisoners); *Walker v. Ahitow*, 9 F.3d 1549 (7th Cir. 1993) (unpublished) (prisoner seen by outside specialists for a "minor scrape evidencing little blood"); *Williams v. Broglin*, 955 F.2d 46 (7th Cir. 1992) (unpublished) (prisoner referred to outside specialists after complaining of "headaches, neck pain, and blackouts"). The Court therefore finds a reasonable likelihood that Foster will prevail on the merits of his deliberate indifference claim with regard to Dr. Patterson and Dr. Ghosh, the individuals who had direct control over Foster's medical care.

8

Defendant Dr. Ghosh cites *Randle v. Mesrobian*, 1998 WL 551941, 165 F.3d 32 (7th Cir. Aug. 27, 1998), to support his argument that Foster merely disagrees with Dr. Patterson's recommended treatment, and as such, will not succeed on his deliberate indifference claim. In *Randle*, the court held that failing to refer a prisoner to a cardiologist during the ten days between his first and second myocardial infarctions did not constitute deliberate indifference, and that the prisoner's request to see a cardiologist was merely a difference in opinion on how to best treat the condition. *Id.* However, the *Randle* court noted that the prisoner's care was far from lacking because the prisoner was immediately transferred to a hospital after the first myocardial infarction, and when his condition stabilized, he was kept in the prison's infirmary for five days under 24-hour surveillance. *Id.* The prisoner requested to leave the infirmary, and when he was permitted to do so, he was given heart medications and plans for a check up in one week. *Id.* His second myocardial infarction occurred four days later, and he was again immediately rushed to the hospital. *Id.* The *Randle* court found that the care did not fall into the realm of deliberate indifference because the prisoner was closely monitored and transferred to the hospital each time the prison personnel could not tend to the prisoner's medical need. *Id.* This is a far cry from Foster's situation, where he has been denied access to an ophthalmologist for the past five years.

Importantly, the Seventh Circuit issued *Maddox v. Wexford Health Sources, Inc.*, 2013 WL 4573644, — F. App'x — (7th Cir. Aug. 29, 2013) an unpublished opinion analyzing a factual scenario strikingly similar to Foster's one day before the present motion was fully briefed before this Court. In *Maddox*, the prisoner filed a preliminary injunction motion demanding immediate surgery on a cataract in his eye. *Id.* at *1. The prison's optometrists examined the prisoner's eyes five times between July 2010 and October 2011, each time noting that his eyesight was worsening but noting specifically that the prisoner's condition would be monitored,

9

and subsequently following through on that monitoring. *Id.* at *1–2. The prisoner alleged that he was promised cataract surgery but never received it, and therefore lost all vision in his right eye and partial vision in his left eye. *Id.* at *1. Even if that were true (the court did not find evidence of surgery being ordered in the record), the prisoner filed his motion before serving any of the defendants and "*before an op[h]tha[l]mologist or other specialist had rendered an expert opinion concerning the need for surgery or its urgency.*" *Id.* (emphasis added). Moreover, shortly after he filed the motion, he received the surgery he sought. *Id.* at *2. Based on these facts, the *Maddox* court held that the prisoner was "nowhere close to establishing deliberate indifference." *Id.* at *3.

Unlike the prisoner in *Maddox* who demanded surgery without a clear evidentiary basis for doing so, Foster is only asking to be *evaluated* by an ophthalmologist to determine how to treat his cataracts. The *Maddox* court highlighted the fact that all of the doctors who evaluated the prisoner were optometrists, but that no ophthalmologist or other specialist had been consulted to determine whether surgery was required. Nevertheless, the prisoner was seen five times so the optometrists could monitor his condition, and thus the prisoner could not demonstrate deliberate indifference. In contrast, Foster, who had a history of retinal detachment and cataracts that might add complexity to evaluating his complaints and determining whether surgery is necessary or even possible, had no such follow up examinations. But perhaps the most striking difference between the prisoner in *Maddox* and Foster is that after the prisoner filed his motion in February 2012, he received a surgery consultation in May 2012 and the surgery in July 2012. *Id.* at *2. The Defendants have taken no similar action here, and instead have continually rejected Foster's reasonable request to consult with a specialist to determine what course of treatment is appropriate. Defendants allude to cost as the reason for this rejection, but more resources have

surely been expended defending against this federal lawsuit than would have been if Foster were simply taken to consult with an ophthalmologist to begin with.

### B. No adequate remedy at law exists.

"An injunction is an equitable remedy warranted only when the plaintiff has no adequate remedy at law, such as monetary damages." *Boucher v. Sch. Bd. of Sch. Dist. of Greenfield*, 134 F.3d 821, 823 (7th Cir. 1998). For Foster, the consequence of inaction at this stage would be further deteriorated vision in both eyes that creates risk in two ways. First, Foster's impaired vision makes him more susceptible to other injuries, such as tripping and falling, or even victimization by other inmates. Second, the larger Foster's cataracts become, the more likely he is to develop secondary glaucoma:

> Glaucoma is a group of eye diseases that cause blindness by damaging the nerve cells located in the back of the eye (the optic nerve camera). In many cases this damage to the optic nerve is thought to be caused in part by increased pressure in the eye (intraocular pressure, or IOP) that results from the buildup of fluid inside the eye.
>
>        \*      \*      \*
>
> Secondary Glaucoma. . . . A cataract that causes swelling of the lens can cause glaucoma (phacomorphic glaucoma). As the cataract develops, the eye's lens thickens and closes the drainage angle, leading to an increase in intraocular pressure (IOP). Medicines and possibly surgery may be used to relieve the pressure. Removal of the cataract is usually necessary to treat phacomorphic glaucoma.

WebMD Eye Health Center, *Glaucoma – Cause*, http://www.webmd.com/eye-health/tc/glaucoma-cause (last visited November 21, 2013). Although Foster also seeks monetary relief in his underlying claim, that cannot adequately compensate for a known risk to his health that could be presently addressed.

### C. Foster will suffer irreparable harm if the preliminary injunction is denied.

Foster's harm is irreparable if it cannot be undone following the adjudication and a final determination on the merits of his underlying claim. *See Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980). As discussed above, Foster's cataracts have been growing in both eyes for five years. His case has been pending before this Court for two of those five years. The longer Foster must wait to merely consult an ophthalmologist, the larger his cataracts will become, impeding his vision and increasing his risk of developing secondary glaucoma. The Court therefore finds Foster will suffer irreparable harm if the preliminary injunction—that asks only that he consult with an ophthalmologist and receive correspondingly adequate treatment—is denied.

### D. The irreparable harm Foster will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted.

In determining whether the harm Foster will suffer if the injunction is denied outweighs the harm the Defendants will suffer if it is granted, the Court "employs a sliding scale approach: the more likely [Foster] is to win [on his underlying claim], the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Girl Scouts of Manitou*, 549 F.3d at 1086. The Court has already found that Foster's underlying claim has a reasonable likelihood of success. As discussed above, the harm Foster will suffer if the preliminary injunction is denied is that his cataracts will grow and further impair his eyesight and increase his risk of secondary glaucoma. The Defendants argue that their harm will be the cost of having an ophthalmologist evaluate Foster's eyes, an action that is "irreversible." Implicit in the Defendants' argument is that the harm to them would be the cost of Foster's evaluation. Choosing a treatment for a prisoner based on cost and not efficacy is evidence of

deliberate indifference. *See Gulley v. Ghosh*, 864 F. Supp. 2d 725, 729 (N.D. Ill. 2012) ("A prison medical official is also deliberately indifferent if the official pursues a course of treatment based on cost rather than sound medical judgment." (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). Moreover, prisons regularly refer prisoners to specialists when they are unable to fully treat them, as discussed above. The Court therefore finds that the cost Defendants will bear providing adequate care to Foster does not outweigh the harm he will endure if his cataracts remain unevaluated.

### E. The preliminary injunction will not harm the public interest.

Finally, "Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the 'public interest')." *Girl Scouts of Manitou*, 549 F.3d at 1086. Here, the nonparty is the public, who would be paying the bill for Foster's ophthalmologist. Because Illinois taxpayers have a vested interest in ensuring that the constitutional rights of its citizens are protected, the Court finds that permitting Foster to see an ophthalmologist for his cataracts does not harm the public interest.

## CONCLUSION

For the reasons set forth above, the Court grants Foster's motion for a preliminary injunction to be evaluated by an ophthalmologist and receive treatment consistent with his or her recommendations. For the avoidance of doubt, this order does not entitle Foster to any specific treatment, such as cataract removal surgery; it merely requires consultation by an ophthalmologist and adherence to that specialist's directives, which may or may include a recommendation for surgery or other treatments. The Court hereby directs Dr. Patterson and Dr. Ghosh's successor, the current medical director at Stateville Correctional Center,[4] to carry out this order within 120 days.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: November 26, 2013

---

[4] Dr. Ghosh retired as the medical director of Stateville Correctional Center on March 31, 2011. (Dkt. No. 118.)